UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 21-CR-20109-JLK

UNITED STATES OF AMERICA,                    )    Page 1-28
                                             )
                   vs.                       )    Miami, Florida
                                             )
JIHAD MUHAMMAD ALI,                          )    September 30, 2021
                                             )    11:00 A.M.
                   Defendant.                )

TRANSCRIPT OF ZOOM SENTENCING
BEFORE THE HONORABLE JAMES LAWRENCE KING
U.S. DISTRICT JUDGE

APPEARANCES:

For the Government:        JONATHAN DOUGLAS STRATTON
                           United States Attorney's Office
                           99 NE 4th Street
                           6th Floor
                           Miami, Florida  33132

For the Defendant:         R. MICHAEL HURSEY
                           Michael Hursey PA
                           5220 South University Drive
                           Suite C-110
                           Fort Lauderdale, Florida  33328

Reported by:               VERNITA ALLEN-WILLIAMS
Vernita_Allen-Williams     Relief Court Reporter
@flsd.uscourts.gov         United States District Court
                           400 North Miami Avenue
                           Miami, Florida 33128

11:01AM

THE COURTROOM DEPUTY:  The United States District Court in and for the Southern District of Florida is now in session.  The Honorable James Lawrence King presiding.

This morning we have a sentencing hearing in the matter of the United States vs. Jihad Muhammad Ali, Case No. 21-CR-20109.

Counsel, will you please state your name for the record.

MR. STRATTON:  Good morning, Your Honor.  Jonathan Stratton on behalf of the United States.  With me today is FBI Special Agent Sean Kibby.

THE COURT:  Good morning, Mr. Stratton.  For the defense, please.

MR. HURSEY:  Good morning, Your Honor.  Michael Hursey here for Mr. Ali, who consents to proceeding by Zoom.  Good seeing you there, Judge.

THE COURT:  Good morning, Mr. Hursey.  Good to see you. And thank you for clarifying the requirement that the defendant has to agree to a Zoom hearing.  Thank you.

MR. HURSEY:  Yes.

THE COURT:  I've read and reviewed the entire presentence report and all the pleadings, save and except some documents which were filed this morning, which I have not yet read; or at least they were received by my courtroom deputy this morning, which is an addendum, I think.

But basically it was clear that the parties had reviewed -- the lawyers had reviewed the presentence investigation report

and have basically no objection with the PSI, and they would announce and discuss.

And for the defense, Mr. Hursey, you will present all of that at the time we were considering your other motions about the guideline range, et cetera.

With that background, let me inquire: Do each of you have any objections -- save the part that defense is going to raise about age and other factors at the sentencing hearing -- but on the facts of the PSI and the PSI in general?

So does the government have any objections? You said you do not. There are no objections?

MR. STRATTON: That is correct, Your Honor, the government has no objections.

THE COURT: All right. And you, therefore, believe that their recommended 35 point total offense level, with a criminal history category VI is accurate and correct, with an advisory recommendation of 60 months under the advisory guideline range? Do you agree with that?

MR. STRATTON: Yes, Your Honor, that is the statutory maximum that the defendant could be sentenced, that's correct.

THE COURT: All right. Mr. Hursey, any particular specific objections that have not been noted to the PSI, and are you in agreement that under the PSI these are the advisory guideline ranges: the statutory amount of 60 months, total offense level 35, criminal history category VI? Is that correct,

Mr. Hursey, as far as --

MR. HURSEY: Yes, Judge. Yes, Judge. And to save the Court and the government some time, I've talked to Mr. Ali, we waive all of the objections that we previously filed to the PSI, including the one that was filed -- it was either late last night or this morning, via the addendum. So I've talked to him about those, and we want to waive all our previously-filed objections.

THE COURT: Thank you, Mr. Hursey. I appreciate that.

MR. HURSEY: Absolutely.

THE COURT: Therefore, the Court does find -- makes as a finding that we're dealing with a total offense level 35, criminal history Category VI, with the advisory provision of 60 months custody.

All right. With that in the background, now, I am aware that you all have been conversing, as good professional lawyers do in these matters, and have reached an agreement.

Would the government tell me about the agreement.

MR. STRATTON: Your Honor, there was an agreement. As Your Honor noted, there is a total offense level of 35, a criminal history Category VI. That would usually dictate as a guideline range of 292 to 365 months. The agreement that was reached between the parties, Your Honor, and the defendant pleading to an information, capped his criminal exposure to a total of 60 months. So essentially a 15-year reduction as to the defendant's criminal exposure. So that's the agreement that was reached.

The government is requesting and recommending to the Court that the Court sentence the defendant to the entirety of that 60-month sentence.  But that was the agreement that was reached between the parties that led us to the position we are in now.

THE COURT:  Thank you very much, Mr. Stratton.  Mr. Hursey --

MR. HURSEY:  Yes, Judge.

THE COURT:  -- let me invite you to present whatever you wish by way of argument -- well, first to the recommendation of the government, and then we can go -- well, then we can go forward with your argument.

MR. HURSEY:  Okay.  Very good, Judge.  Part of the plea agreement -- and I thank the government again for letting us have the five-year count, which took a lot of negotiations and I know that Mr. Stratton and AUSAs here had to go to Washington to get that, and I also conversed with Washington as well to convince them that this was a just thing to do.

And with this, we still maintain on the defense side the capability to ask the Court to go below the five years or 60 months statutory maximum here.  And we ask the Court to seriously consider sentencing my client, Mr. Ali, to time served.

Judge, he's been in custody for -- as of today, 30 months and 15 days when one calculates the time he spent in Syria.  He was arrested in Syria by U.S. coalition forces, the Marines, put

in jail at that time, and he's been in custody since then.

Now, he was extradited from Syria to the United States on September 29th of 2020; almost a year to the day exactly from today. So he's been in official U.S. custody for that time. He was in custody in Syria, we would say, under U.S. detention, and he should get credit for that too.

Now, Judge, you probably don't have the authority right now to give him credit for time served for that time in Syria. That probably technically is the attorney general after he gets your sentence, and they can give him credit for time served in Syria. But this Court can certainly take that into account; that he's only 20 years of age now, he left the U.S. with his father at age 14, so he was an eighth grader when he went to Syria back in 2017. And so -- I'm sorry. That was 2015. And he was arrested when he was 17 years old. He's 20-years old now. So we'd ask the Court to take that into consideration when sentencing him.

And we have his mother, and you see her there as -- I just saw her. She would like to briefly address the Court, and she's going to describe. There are just a couple other relatives on there. We're not going to have them speak but just identify them for the record. And we would ask the Court to give him time served so he can return back to his family.

So with that, I'd ask, Ms. Mohammed, if you could --

If it please the Court, we'll just have her briefly address you, Judge, as his mother. And she'll identify for the

Court the other individuals that are on the Zoom conference with us. They will not speak.

THE COURT: Joyce, swear the mother. And, I presume, go ahead and swear the defendant, the two of them at the same time if you can.

THE COURTROOM DEPUTY: Yes. Will you please raise your right hand, mother and Mr. Muhammad. Mr. Muhammad? Mr. Jihad Ali, you too.

MS. MOHAMMED: His name is Jihad.

THE COURTROOM DEPUTY: Jihad, sorry.

(Duly sworn.)

MS. MOHAMMED: I do.

THE COURT: Put your hand down.

THE COURTROOM DEPUTY: Okay. Thank you.

MR. HURSEY: Ms. Mohammed, can you tell the Judge what you want him to consider before he passes sentence on your son.

MS. MOHAMMED: Yes, I do.

MR. HURSEY: So please go ahead and tell the Judge what you want him to hear.

MS. MOHAMMED: Your Honor, Judge King, my name is Arifah Mohammed, and I am the biological mother of Jihad Ali. Jihad grew up in a home where he would always seek permission for anything that he needed, and he was always respectful and obedient.

Jihad is a very kind, loving, caring, responsible child, who is loved dearly by his family, his friends, and people in the

community. Being the eldest of the four children, Jihad would always look out for and seek the best interests of his siblings.

Jihad's father and I got divorced when he was just nine years old, and he was taken from me at that time to live with his dad. Then six years ago, at the age of 14, he was taken to Syria without my knowledge. For all this time, up until this day, I have grieved for my son. I worry about him and his safety, because he is just a child -- he was just a child who had no choice in the matter.

Your Honor, I do not expect you or anyone else here to understand because, obviously, none of you have ever been in this situation. Whatever Jihad did or did not do, I believe it was justified. I know he is remorseful, and if given the opportunity he would do things differently.

I ask you, Your Honor, to please have compassion and mercy and grant Jihad his freedom, for he has suffered tremendous torture in the prisons in Syria for over one year and now incarcerated for one year at FDC; or at the very least give him the lightest possible sentence so that soon he can be able to come back to Trinidad and be reunited with his family once again.

MR. HURSEY: Thank you, Ms. Mohammed.

MS. MOHAMMED: Thank you.

MR. HURSEY: Can you identify for us the other individuals that are on the monitor that the Judge is seeing?

MS. MOHAMMED: I'm not finished, Mr. Hursey.

MR. HURSEY: Oh, I'm sorry. I'm sorry. Okay. Go ahead.

MS. MOHAMMED: Your Honor, I speak to Jihad on a daily basis. And he's a kind, loving, caring, responsible child. He is even well loved by the inmates at FDC, because he's always willing to help, even give the very last of what he has. Jihad is very smart and confident and has the potential to succeed in any endeavors.

I take full responsibility for Jihad when he gets back to Trinidad and Tobago.

Lastly, Your Honor, for the record, neither Jihad, nor myself, or anyone else in our family ever indicated that Jihad wished to be counseled by a family ISIS imam in Trinidad. I live here, and in fact I do not even affiliate myself with that community.

I spoke to Jihad's attorney, Mr. Hursey, yesterday, and he indicated to me that the paralegal, Younes Ali, is the one that told him this. Shortly after I spoke to Younes Ali, and he confirmed that he had never spoken to Mr. Hursey. But Mr. Younes Ali is here today to testify on behalf of Jihad, as well as to discuss, Your Honor, certain matters relating to Jihad after he is sentenced; also to clear up whatever misunderstanding there is with Mr. Hursey. Thank you very much.

I have my mom, Zobida Mohammed, which is Jihad's grandmother; I have his aunt and his siblings, Alia, Anima, and Islam (phonetic). Thank you.

MR. HURSEY: Okay. Thank you. And, Judge, at this time Mr. Ali himself wanted to make some comments to the Court.

THE COURT: Mr. Hursey, before we do that -- thank you. Let me make sure that the government or ask the government: Do you have any cross-examination of the witness that just testified, Mrs. Mohammed? Any cross-examination?

MR. STRATTON: No, Your Honor. Thank you.

THE COURT: Thank you. Mr. Hursey, thank you. Would you proceed with your client's testimony.

MR. HURSEY: Yes, Your Honor. Thank you.

Mr. Ali, is there anything you wanted to say to the Court before he passes sentence on you?

MR. STRATTON: Just so Mr. Ali knows, his mic is muted.

MR. HURSEY: Oh, that's right. Mr. Ali, you have to do it yourself or ask the guard there to put your volume on.

IT STAFFER: It takes about 30 seconds, sir, before he comes back online.

THE COURTROOM DEPUTY: Okay.

(Brief pause.)

MR. HURSEY: Okay. Mr. Ali, we can hear you now. Can you hear us okay?

BY THE DEFENDANT: Yeah.

MR. HURSEY: Okay. Keep your voice up, and please tell the Judge what you want him to consider before he passes sentence on you.

BY THE DEFENDANT:  Today I am before the Court to be sentenced.  It is for the charge of terrorism; although I've never hurt anyone.  I looked in the dictionary for the word terrorism and still don't understand it or how it relates to me.  I asked my lawyer, and what he said didn't make sense to me.

What makes me a terrorist?  My beliefs?  My skin color?  Or wanting to living under Islamic law?  I admit to living under the Islamic (unintelligible) which is not as the news shows it to be.  The caliphate was not only for Muslims.  They were Christians, Jews, who choose to live there; and from what I have seen, they were happy to be there.  I never saw anyone murdered, robbed, or raped over there.  There was no drug or alcohol addiction.

I was married to a British Muslim woman who is now in a Syrian refugee camp controlled by some of the worst people I have ever seen in my life, the Kurds.  Me and my wife tried to have kids, and every time it was a miscarriage or the baby died at birth.  Why?  She was afraid all of the time.  Of who?  Of the planes above bombing with the most deadliest weapons known to man.  Every second of every day towards the end she was terrified of me stepping out and being turned into a (unintelligible), terrified of being captured and raped and killed like many of my other Muslim sisters.

After being struck I would go out to check for survivors and injured.  I once saw a young kid crying and screaming "Mommy.

Mommy," while being held in his mother's arms.  She was sitting up dead and her blood was pouring on the baby.

My stepdaughter, a two-year-old infant, who was murdered in cold blood with no remorse, is this not terrorism?  I ask because I am confused.  Why do people who do evil things are not called a terrorist?  But I am being called a terrorist simply for moving with my family to Islamic state.

The people they call a terrorist are the same people who comes to save us when the coalition forces are terrorizing us, and they help the injured and take care of that same crying baby.  I don't say that they were perfect, but it wasn't always like that. I remember the ice cream shop in (unintelligible) where we used to buy sweets and ice cream for us and other kids and hand out.  The ice cream shop is no longer there because a coalition bomb hit it. It was an old Arab man who was not part of ISIS who owned the store.  I don't know why they destroyed it.  The same for a children school I used to go to.  They destroyed it with one of the biggest bombs I've ever seen in my life.

Is selling ice cream to kids or going to school something bad?  Perhaps I'm supposed to ask for mercy now and take my lawyer's advice and pin everything on my dad, my father.  So what I'm supposed to do?  Sit here and paint a picture of that man as a monster?  A father who tried to do what he believed was best for his family, a man who has one son also in jail and another in foster care taken by the government and blocked from returning

home to his mother in Trinidad, a man -- a man whose wife and children live in a Syrian refugee camp in starvation and dismay, a man who never carried arms but carried love in his heart and buying medicine and food for those who had none, a man who went out bravely in the middle of bombing to save children at risk of being annihilated, a man who brought cheer to those who were down and never fired a shot in anger.

Maybe this is not the man they wish to understand.  They prefer him a radical, terrorist, monster, or villain.  I agreed to being brought to Syria as a minor.  I don't admit to my father being a terrorist or evil man, and I don't admit to any medical disorder.

I admit to the pain, the pain I feel in my heart, the pain or suffering which anyone has been afflicted by it.  If hearts are not softened on their own, then no amount of speech will ever affect it or cause it to shed tears.  If mines isn't a sad story, then I can't even expect to convince someone otherwise. I simply request understanding.

BY THE DEFENDANT:  I think that's it.

MR. HURSEY:  Ms. Mohammed, did you tell the Judge who the other people are; like the man, for example?

MS. MOHAMMED:  Yes, I did.  I have my mom, Jihad's grandmother, I have his sister and his brother, his aunt.

MR. HURSEY:  Okay.  Very good.  Thank you.  Thank you, Judge.  That ends my presentation for the moment.

THE COURTROOM DEPUTY:  Can you mute the jail again, please.

THE COURT:  We want cross-examination here, if any.

MR. STRATTON:  Your Honor, the government doesn't have cross-examination for the defendant.  I don't think it's a good use of everyone's time, but I do have tremendous response, if the Court would let me at the appropriate time, to respond to a lot of the things that the defendant just stated, that gives the government significant concern about his dangerousness, his lack of remorse, and his responsibility for his acts while in Syria.

THE COURT:  You will certainly have time to speak in the sentencing aspect.  This was simply if you had anything you thought you wished to cross at this point.  I wanted to make sure that both sides had a fair opportunity to conduct this evidentiary hearing.

The defendant appeared to be reading from a document; and I do not say that critically.  I simply say that I neglected to mention earlier that I had read a letter that the defendant sent to me.  And many of the things he touched on in his statement, Mr. Hursey, and to his mother, Ms. Mohammed, were familiar from the letter that I had read, and it may be the same document.

But I want him to know, his parents to know, and defense counsel, and the government to know that I had read all of the documents submitted to me prior to this hearing.  So, therefore -- and including the government's response to the well-written

documents by the defense on behalf of the defendant.

So I will move on then -- unless there are any other witnesses, Mr. Hursey, you believe that there is a need to call -- to open it to argument on your motion to depart downward from the guidelines and your argument.  Mr. Hursey, any other witnesses?

MR. HURSEY:  Thank you, Judge, for having read those documents in advance and the letters from his family and friends, but I have no further witnesses or evidence at this point.

THE COURT:  All right.  Does the government have any responsive witnesses to the defendant's motion to depart downward from the guidelines?

MR. STRATTON:  No, Your Honor.

THE COURT:  Good.  All right.  Then at this point in time I will invite the parties to state their positions.  Let's see.  Actually, the government has brought to my attention Section 5(k)2.13, about departure from the guideline range, where the sentencing guidelines commission and the sections of the statute, Section 5(k)2.13, expressly direct the Court not to depart if the facts and circumstances indicate that the offense is -- there is a need to protect the public interest because the offense involved actual violence.  You probably would have or may have something to say on that issue.

But it seems to me under the facts of this case that that provision really comes into play in this case where there was from the facts of the PSI undoubtedly actual violence by the defendant

by his firing of an AK-47 weapon at the coalition forces in Syria, which led to his ultimate capture and confinement by the military in Syria during what appears to be the battleground of a war going on over there.

The other facts indicate that the defendant as an adult was participating in the war and made public statements regarding -- in Syria that he was actually a fighter for ISIS; and, therefore, was -- that brought credit on him and his family there or may have; at least that may have been the reason he did this.  His age is a factor in all of this.  But because of this, I believe I should deny the motion to depart from the guidelines.

And I am inclined to consider your argument now on any arguments pro or con about the guidelines that either side wished to make regarding what the sentence should be.  But I respect the experience of lawyers.  I respect to know --

Now, Mr. Hursey is a very competent and experienced attorney and would observe that he has exercised himself together with what appears to be an understanding attitude of, certainly, counsel for the defense and the Department of Defense, Mr. Stratton, regarding his age and these other factors.  So although there is still open the question of whether or not there would be an upward departure given the seriousness of these allegations, and the fact that -- but the fact that it comes before me at this point as a guilty plea to an information and these other factors which you have so thoroughly, both of you, outlined in excellent

pleadings, I'm sort of inclined to approve the agreement you have made and not depart upward or downward.

With that announcement, and not wishing to interfere with your, I'm sure, well prepared arguments for me, I will open it to your arguments at this time.  I can start with either one.  But let me, I guess, start with the government in this particular case; since Mr. Stratton has referred to it once before, he had some things he wished to state with regard to the pleadings and other remarks.

All right.  Mr. Stratton, you have heard my inclination at this point, but I'll be pleased to listen to you, followed by Mr. Hursey when you finish.  Mr. Stratton.

MR. STRATTON:  Thank you, Your Honor.  And I'll keep it brief because I think Your Honor's inclinations are correct, and I think a 60-month sentence is correct, so I don't want to steer Your Honor away from that ultimate outcome.

Your Honor's absolutely right that the defendant as an adult conducted military operations on behalf of ISIS.  The defendant mentioned in his remarks:  What is terrorism?  The terroristic acts of ISIS are well documented.  The atrocities are well documented.  He supported that organization that beheads journalists, that throws homosexuals off the top of buildings.  That is terrorism.

It is almost as if the defendant is trying to implicate that the United States at some level is the actual terrorist.

That gives the government significant concern about, A, the defendant's remorse; and, B, the defendant's acceptance of responsibility.

I went to significant lengths to get this defendant a five-year agreement.  He was originally facing 20 years incarceration.  And, in fact, his appropriate guideline range recommends a period over 20 years of incarceration.

I have significant concerns now, based on the defendant's remarks, that that was the right thing to do because the defendant, moreover, indicated that his attorney instructed him to blame his father and that he has no intention of doing so; and, in fact, takes full responsibility for his actions while in Syria, which included firing on coalition forces; which included conducting military operations; which included becoming a supply manager for an ISIS battalion.  It also included military training.  It also included religious training.

So if the defendant is accepting full responsibility for all of those actions, a five-year sentence is under-representing his criminal conduct.  But, Your Honor, we will stand by the agreement that we had before and your inclinations, and we will recommend a five-year sentence.

But his remarks, as I say, gives me significant concern about the defendant's remorse; although it does indicate he takes full responsibility for supporting a terrorist organization whose atrocities are well documented, and I don't think I need to expand

on that further here.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Stratton.

Mr. Hursey, I'll be pleased to hear from you on behalf of the defendant.

MR. HURSEY:  Very good, Judge.  Just very briefly, even as he stands before the Court today, he's 20 years old and sometimes, Judge, you and I both know that sometimes 20-year olds take the big picture of things.  We do appreciate what the government did in giving us the five-year max.  And I worked very hard with Mr. Stratton, saw many of his efforts to get that, so that is not lost on either myself or my client.

I would just remind the Court that he was 14 years old when he left.  And you can imagine, Judge, when you're 14 years old, you're following your father's lead, that's what happens.  His father loved him, and he loves his father still.  They have a great relationship.  But as a 14-year old, you can take that into account; that he was doing what his father asked him to do.  And he was arrested as a 17-year-old, which still is not the age of maturity.  So he was still a minor, even when he was arrested on the battlefield in Syria.

So in light of the fact, Judge, that he has spent 30 months of his life in detention now -- so that's about one-sixth of his whole life in incarceration -- we'd ask the Court to consider that, because you do have the authority under Booker, Judge, to give a variance a little bit under the five, so this man

can get back on track, be reunited with his family, and continue his education. His education stopped at eighth grade, and so he lacked -- he's been trying to take some classes while he's there at FDC. And he is admired by the people at FDC because they see his tender heart, and a lot of the older inmates have reached out to him to help him because they've realized he's just kind of a kid in their group. So we would ask the Court to consider that and do a downward variance to time served.

And whatever you do with that, Judge, we'd ask that in your judgment of commitment order that you find that he should get credit for the time in Syria from the 2017 arrest until he was extradited. So that would be an extra 18 months. And when the attorney general makes his decision as to how much credit for time served, he would give your recommendation great weight.

Thank you, Your Honor, as always.

THE COURT: Anything in brief rebuttal by the government?

MR. STRATTON: Your Honor, just two quick things. One is that the defendant surrendered to Syrian defense forces in Syria. He was not transported or taken to U.S. custody until 2019, so I think a 60-month sentence is appropriate. As defense counsel alluded to, it is ultimately the Bureau of Prison's determination as to how much time served he will get for that, but I think Your Honor's judgment of 60-months is appropriate.

And then finally -- and I'll just make this point briefly -- there was a lot of discussion about the defendant's mother

looking out for him or taking care of him and being reunited with his family.  It is a significant question whether the defendant will ever be allowed back into Trinidad and Tobago.  The Trinidadian government has made it clear that they are not taking back terrorists that fought in Syria, and I don't anticipate that changing.

So I would just suggest to you, Your Honor, that the defendant at the end of his sentence will be -- will probably remain in the United States and will continue to present a danger to the community.  Thank you, Your Honor.

THE COURT:  Thank you.  The motion to depart below the sentencing guidelines is denied.

The Court has carefully considered the pleadings and the statements of the parties, including the letter that I received from the defendant, which I have ordered the courtroom deputy to post in the docket record that, the docket sheet of this case, and carefully reviewed and gone back and reread Title 18 U.S. Code, Section 3553 and the eight different factors there.  I say that because normally I have that after having sentenced -- well, some indication thousands of defendants.  The AO -- the Administrative Office has indicated I may have had as many as 6,000 defendants come before me in the last 50 years.  Mr. Hursey has been on a few of those, maybe many of them.

MR. HURSEY:  Yes.

THE COURT:  But Mr. Stratton, with a good career with the

U.S. attorney, will also, hopefully, if all goes well, will be before me again.

MR. STRATTON:  I have my fingers crossed, Your Honor.

THE COURT:  I'm sorry?

MR. STRATTON:  I said I have my fingers crossed.

THE COURT:  The point being that the seriousness of this case may be one of the most serious that the Court has really considered, in that it's a direct involvement with somebody that has at a very young age, with a very very tragic background as a kid growing up with a father who, obviously, is very very imbued with the ISIS fighters and the ISIS principles of fighting against -- in the battlefield fighting against Americans, who are the direct enemy fighting on the battlefield, which is as about as serious as a case can get.

The Court does not mention this in any way to suggest that the government's evaluation and ultimately agreeing to an information is in any way a wrong decision.  I do not make any fact finding on that, except to say that it impresses the Court with two factors:

One, the expertise and diligence with which Mr. Hursey has brought to the defense of his client, which he always does;

And the care, consideration, and thought that, obviously, many of the persons in the Department of Justice sparked and driven by Mr. Stratton's evaluation of the background of this case, which has also persuaded the Court to sentence within the

guideline range and not depart upwards.

I say all that because there may be a tendency by those who pick up the work we do here in the federal court and make some comment on it at some future days in the press or radio or whatnot, I hope that does not happen, I would wish it never happened. Sometimes they wish to compliment judges and sometimes they don't. But judges don't need any compliments; at least this judge, certainly has proven in 50 years that I'm not looking to be concerned about compliments from how my decisions are formulated. I do it in the best possible way I can, within the facts as I find them.

And so, therefore, I want to make that clear from the standpoint of the Department of Defense -- excuse me, the Department of Justice.

And I've gone through these and because this is such a serious case and given a lot of thought and consideration to the tragic, terrible upbringing the defendant was subjected to for the 14 years before he went to Syria when he was 14, and over there what he has been subjected to by the public and the public comments and the attitude of the Syrians, and so on, is tragic, tragic, tragic, and my inclination was to sentence him above the guideline range.

But taking all of these factors and finding that he's had a tragic upbringing under the domination of his father, apparently both here and when he got to Syria, I'm impressed with his

mother's eloquent and very concise, very competent talk on his behalf, and these factors all bring me to the conclusion that even though this is a case that the Court might well have sentenced at a high range, I do intend to follow the eight considerations of Title 18, U.S. Code 3553, and find that this is a fair and proper sentence for the defendant.

The defendant will stand.  And I say to you, Jihad Ali, that after consideration of all the factors in the case, that the Court finds, number one, that you're unable to pay a fine. Therefore, no fine is imposed.

It is the judgment of the Court that you, Jihad Muhammad Ali, be committed to the Bureau of Prisons for a period of 60 months.  Sixty months, followed by three years of supervised release, during which you shall comply with all the mandatory and standard conditions of supervised release; including not committing any crimes, not possessing a firearm or other dangerous device, not unlawfully possessing a controlled substance, and cooperate in the collection of DNA evidence.

The defendant shall comply with further treatment while incarcerated for mental health, permissible search.  And the mental health is treatment in custody.

But as part of the three years of supervised release, permissible search, any unpaid restitution, fines, or special assessments, as noted in Part F of the presentence report.

And the Court orders that he pay the $100 assessment

mandated by law. No fine, but mandated by law the $100 assessment.

Now, under U.S. vs Jones, I ask defense and government if you have any objection to the sentence or the manner in which it was pronounced? That's U.S. v. Jones from 30 years ago, I ask it in every case: Any objection to the findings of fact or the sentence or the manner in which it was imposed by me on the record? From the government?

MR. STRATTON: Nothing from the government, Your Honor. Thank you.

THE COURT: Mr. Hursey?

MR. HURSEY: Judge, just for purposes of the record, we would object to the Court not granting a Booker variance.

THE COURT: Yes, of course. And I meant to say that anything and everything said, on behalf of the defense or the government, is fully preserved in this record and shall be considered by the Court -- was considered by the Court without the necessity of retaining jurisdiction to argue it should the defendant desire to take an appeal, which he is advised he must take within 14 days, if he can't afford a lawyer, on appropriate showing, one will be appointed for him.

All right. And everything that Mr. Hursey said and Mr. Stratton said is in the record. And whether you touch on it again by way of this Jones objection or not, the defendant is fully protected by raising it on appeal should he so elect.

All right.  Are there any other --

MS. JOHNSON:  Your Honor, can I just clarify.  I just want to clarify.

THE COURT:  Before you open your mouth, wait till I finish.  I'm talking.

MS. JOHNSON:  I'm sorry, Your Honor.

THE COURT:  Just wait a minute.  I have now reached the point where I will ask the defendant if he has any motions through counsel to make regarding the place of confinement.  I have considered and determined that I will --

Well, that as far as the motion for the time that he has served after he surrendered to U.S. forces in Syria, I will not make any recommendations on that.

With regard to the question of a place for his confinement, do you have, Mr. Hursey, a motion as to a recommendation you wish me to make regarding place of confinement -- which we all know is up to the Bureau of Prisons -- Mr. Hursey?

MR. HURSEY:  Yes, Judge.  Thank you.  And I told Mr. Ali that the Court can only make a recommendation; it's not binding on the Bureau of Prisons, but they always respect what you say, Judge, and they try to do that.

And in light of that -- and I've talked to Mr. Ali and his mother -- our first choice would be Miami.  And if that isn't possible, we'd ask that he be designated to Atlanta.  He has a sister in the Atlanta area that would be able to visit him, so

that would be our two choices, Judge.  The first one is Miami; second is Atlanta.

THE COURT:  Thank you.  That motion, without objection, I'm sure, by the government is granted.  If the government has an objection, so state.

But I will recommend to the Bureau of Prisons, number one, the facility in Miami, Florida; and, number two, the facility in Atlanta for the reasons just stated about visitation by relatives.  That motion is granted.

MR. HURSEY:  Thank you very much, Judge.

THE COURT:  I'm sorry?

MR. HURSEY:  Thank you very much for that.  We appreciate it.

THE COURT:  All right.  Now then, does the government have --

Does the probation officer have anything that you think I did not cover that you want to bring to my attention at this time?

MS. JOHNSON:  No, Your Honor.  I just wanted to clarify. I know you mentioned mental health while he was in custody, and I just wanted to clarify that it is not a condition of supervised release?

THE COURT:  That his custody has nothing to do with supervised release?  Supervised release becomes effective, as in the last thousand or so times I've done this, after he gets out.

MS. JOHNSON:  Yes, Your Honor.

THE COURT:  He can apply for it and all that, but that's later.

MS. JOHNSON:  Yes, Your Honor.

THE COURT:  That's nothing to do with sentencing.

All right.  I'm finished with this.  And I wish to -- I've already stated a comment about the lawyers.

Both lawyers, I wish to say, have done a very excellent job in what is a very difficult case for them.  Perhaps not as much for me, given the fact I've done this for 50 years.  But, nevertheless, I compliment you on that.

And at this point in time, Joyce, unless you have something else, I am going to close my part and the hearing is finished.  Joyce?

THE COURTROOM DEPUTY:  Court is in recess.

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

Please note:  This hearing occurred during the COVID-19 pandemic and is therefore subject to the technological limitations of reporting remotely.

s/ Vernita Allen-Williams
Vernita Allen-Williams, RMR, FCRR
Relief Court Reporter
400 North Miami Avenue
Miami, Florida  33128